NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ZHEJIANG RONGYAO CHEMICAL CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> PFIZER INC., <br><br> Defendant. | Civil Action No. 11-5744 (PGS) <br><br><br> **MEMORANDUM & ORDER** |

SHERIDAN, U.S.D.J.

This matter is before the Court on Defendant's motion to dismiss. For the following reasons, defendant's motion is granted in part and denied in part.

**I.   FACTS**

    **A.   Background**

Plaintiff's complaint alleges the following. Plaintiff Zhejiang Rongyao Chemical Co., Ltd. ("Rongyao") is a pharmaceutical manufacturing company based in China. Defendant Pfizer Inc. ("Pfizer") is a multinational pharmaceutical corporation based in New York state. Pfizer sold and distributed a product called 3-Nitro, which Rongyao manufactured (Compl. ¶¶ 1,2,7,10.).

3-Nitro is used in chicken feed to help the animals gain weight and to prevent an intestinal disease. The drug has been used for over 50 years and is commonplace in the poultry industry. Pfizer holds the New Animal Drug Application ("NADA") and other global regulatory

1

files for that drug, and thus, has the right to sell 3-Nitro anywhere in the world.  Pfizer is the only holder of these regulatory files and, therefore, has market exclusivity.  Rongyao holds the Veterinary Master File ("VMF") for 3-Nitro, and therefore, has the exclusive right to manufacture it.  Because Rongyao is a foreign corporation, the United State Food and Drug Administration ("FDA") requires a domestic agent to act on Rongyao's behalf with respect to the VMF.  Pfizer is Rongyao's VMF agent in the United States (Compl. ¶¶ 7-12).

### B.      Alpharma's Transfer of 3-Nitro Operations to Rongyao

Pfizer acquired Alpharma LLC ("Alpharma") in or about February 2011.  Alpharma is now a part of Pfizer Animal Health, a business unit of Pfizer (Compl. ¶ 3).  Prior to Pfizer's acquisition of Alpharma, Alpharma was the NADA holder and other global registrations holder for 3-Nitro and had the exclusive right to sell that product in the United States and throughout the world.  In or about 2003 or 2004, Alpharma approached Rongyao to inquire about its ability to manufacture 3-Nitro.  Alpharma indicated to Rongyao that it was seeking a long term commitment from Rongyao to produce 3-Nitro for many years into the future.  At the time that Alpharma approached Rongyao regarding the manufacture of 3-Nitro, Rongyao had already been producing another product, 4-Nitro, for Alpharma since 1998, pursuant to the terms of a May 14, 1998 Supply Agreement ("1998 Supply Agreement") (Compl. ¶¶ 18-21).

In or about 2007 or 2008, Rongyao agreed to produce 3-Nitro and Alpharma developed and put into effect an exit strategy to shift the manufacture of 3-Nitro from the United States to Rongyao in China.  The transfer of 3-Nitro manufacturing operations from the United States to Rongyao was a lengthy and costly process that required Rongyao to spend millions of dollars designing, building and supplying its plant in China ("China Plant") and getting all the necessary regulatory and governmental approvals.  Alpharma worked closely with Rongyao in transferring the approvals, organizing and supervising the China Plant's construction and design, and setting up manufacturing

operations there.

In 2009 or 2010, after a two year process, Alpharma was able to obtain the appropriate FDA approvals for Rongyao to manufacture 3-Nitro. As a result of the transfer of the appropriate FDA approvals for the manufacture of 3-Nitro, Rongyao became the exclusive VMF holder for that drug and Alpharma became Rongyao's VMF agent in the United States. As the VMF holder for 3-Nitro, Rongyao became the only entity in the world with FDA approval to manufacture 3-Nitro. (Compl. ¶¶ 22-30).

    C.    The MPA

In or about January 24, 2011, Alpharma drafted an undated Master Purchase Agreement ("MPA") that it submitted to Rongyao. The Complaint does not allege that the MPA was ever signed. The MPA governed not only 3-Nitro, but also 4-Nitro – which Rongyao had already been producing for Alpharma under the 1998 Supply Agreement – and another new and yet to be FDA-approved product named Zoalene (Compl. ¶¶ 31-32). Section 6.2 of the MPA expressly states that the MPA supersedes the 1998 Supply Agreement and that the 1998 Supply Agreement is terminated. Section 5.1 of the MPA, sets forth the term of the contract. It provides the following:

> The term of this Agreement shall be 5 (five) years commencing on the Effective Date (the "initial term"). This Agreement shall automatically renew for additional 2 (two) year periods thereafter, unless notice of termination is given by either Party at least 2 (two) years prior to the desired date of termination (which date may not be earlier than the final day of the initial term).

Section 3.1 of the MPA provides that the parties agreed to "estimated volumes and pricing set forth in "Schedule D." "Schedule D" increased the price for 4-Nitro from $10.78 - $11.78 per kilogram, as set forth in the 1998 Supply Agreement, to $21.00 per kilogram. "Schedule D" also sets forth $14.70 per kilogram as the price for international sales of 3-Nitro and $16.70 as the price for sales of 3-Nitro within the Unites States. "Schedule D" also sets forth $12.00 per kilogram as the price for international sales of Zoalene and $20.00 per kilogram as the price for sales of Zoalene

3

within the Unites States.  Section 3.3 of the MPA requires Alpharma to provide Rongyao with quarterly rolling twelve month forecasts for purchases of the Products (Compl. ¶¶ 35-39).

Despite the fact that the parties never executed the MPA, Alpharma (and, after the acquisition, Pfizer) and Rongyao conducted business pursuant to the terms outlined in that document. Pursuant to Section 3.3 of the MPA, Alpharma submitted a forecast for 2011 to Rongyao for 3-Nitro and 4-Nitro, and Pfizer, through its Alpharma Animal Health unit, submitted forecasts for 2012 for 4-Nitro and Zoalene.  The MPA was also never repudiated by Rongyao, Alpharma, or Pfizer (Compl. ¶¶ 40-43).

In or about February 2011, Pfizer finalized its merger with Alpharma and Alpharma then ceased to become an independent entity.  This merger did not affect the parties' obligations under the MPA, and Rongyao and Pfizer continued to transact business according to the terms set forth in that document.  As a result of Alpharma's merger into Pfizer, Pfizer became the NADA holder for 3-Nitro.  As a result of Alpharma's merger into Pfizer, Pfizer became Rongyao's VMF agent for 3-Nitro (Compl. 44-47).

        D.        **Pfizer's Suspension of 3-Nitro**

On or about, June 8, 2011, Pfizer voluntarily suspended sales of 3-Nitro in the United States. In a June 8, 2011 press release, Pfizer claimed that its decision to suspend sales of 3-Nitro was "in response to a request by the U.S. Food and Drug Administration (FDA) based on a recent study by the Agency."  According to Pfizer's June 8, 2011 press release, the FDA study found that the use of 3-Nitro results in "extremely low residue levels of inorganic arsenic in the liver of treated chickens." The press release stated that the extremely low level of arsenic found in the livers of treated chickens in the FDA study "is equivalent to the amount of inorganic arsenic found in an eight-ounce glass of drinking water."  The press release also acknowledged that "FDA agency officials stressed that there is no imminent public health risk from eating chicken treated with 3-Nitro" and "there is no need for people to alter their consumption of chicken" (Compl. ¶¶ 48-52).

Pfizer made the decision to suspend the sale of 3-Nitro in the United States without any advance notification to or consultation with Rongyao. Rongyao cannot sell 3-Nitro in the United States without Pfizer's participation since Pfizer holds the NADA for 3-Nitro. Pfizer has also acted to withdraw 3-Nitro from territories outside the United States, including Canada and the Philippines. As a result of Pfizer's actions, Rongyao can no longer sell 3-Nitro in the United States, Canada and the Philippines, resulting in hundreds of millions of dollars in damages, including but not limited to lost profits (Compl. ¶¶ 53-56).

Plaintiff commenced this action in October 2011 to recover compensatory damages. Defendants move to dismiss the Complaint for failure to state a claim.

## II.   DISCUSSION

### A.   Standard of Review

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See, e.g.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *Iqbal*, 129 S. Ct. at 1950. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000), *cert. denied, Forbes v. Semerenko*, 531 U.S. 1149, 121 S.Ct. 1091 (2001). While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 129 S. Ct. at 1949; *Morse v. Lower Merion School*

*District*, 132 F.3d 902, 906 (3d Cir.1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir.1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340). The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted); *see also Iqbal*, 129 S. Ct. at 1949-50.

  **B.**  **Rongyao's Submission of Materials Outside of the Pleadings**

Rongyao attached no documents to its Complaint, but later submitted affidavits and other exhibits with its Response. In considering a motion to dismiss, courts should disregard all materials that are outside of the pleadings, except those documents which plaintiff refers to in its Complaint and whose authenticity no party questions. *See* Fed. R. Civ. P. 12(d); *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011). Accordingly, only the draft MPA, its Schedule D, and the 2011 forecast of estimated requirements – the only three documents referred to in the Complaint and whose authenticity is unquestioned by either party – will be considered for the purposes of Pfizer's motion to dismiss.

  **C.**  **Counts I and IV: Breach of the MPA and the Covenant of Good Faith and Fair Dealing**

Rongyao contends that Pfizer's 2011 decision to voluntarily discontinue the purchase of

6

3-Nitro violated the MPA and serves as the basis for the contract claims against Pfizer (Compl. ¶¶ 57-67, 76-81). Pfizer argues that the draft MPA is not enforceable against Pfizer because it was never signed. Therefore, Pfizer agues, the breach of contract claim should be dismissed.

The elements of a breach of contract claim under New Jersey law are that: (1) a valid contract exists; (2) the defendant materially breached the contract; and (3) the plaintiff suffered damages as a result of the breach. *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 421 F.Supp.2d 831, 833 (D.N.J. 2006) (citing *Coyle v. Englander's*, 199 N.J.Super. 212, 223, 488 A.2d 1083 (App. Div. 1985)). The Complaint adequately pleads each of these elements, as it alleged that: (1) Rongyao manufactured 3-Nitro for Pfizer pursuant to a long term supply contract – the MPA – between the parties, whereby Pfizer agreed to purchase 3-Nitro from Rongyao for a minimum five year period (Compl. ¶ 13, 60); (2) Pfizer breached its contract with Rongyao by terminating its agreement to purchase 3-Nitro from Rongyao prior to the expiration of the five-year period set forth in the MPA (Compl. ¶ 61); and (3) "[a]s a proximate result of Pfizer's breach of contract, Rongyao has been damaged." (Compl. ¶ 60).

Pfizer's argument that Rongyao's Complaint fails to plead any exception to the statute of frauds is without merit. A statute of frauds defense, may be raised by a motion to dismiss if the defect appears on the face of the pleading. *See Hanna v. United States Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975). The Third Circuit has ruled that when a motion to dismiss is advanced on the ground that it is barred by an affirmative defense, "the question to be answered thus becomes whether the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a recognized legal basis for avoiding the [defense]." *Leone v. Aetna Casualty & Surety Co.*, 599 F.2d 566, 567 (3d Cir. 1979). Thus, plaintiff's complaint need not specifically plead an exception to a statute of frauds bar, but it

7

must permit the Court to conclude that plaintiff has alleged facts such that it could potentially prove that an exception to the statute's bar existed. Applying this standard in the instant case leads the Court to conclude that the Complaint contains sufficient allegations that an exception to the statute of frauds exists.

One exception potentially applicable here is *N.J.S.A.* 12A:2-201(3)(a), which adopts *U.C.C.* 2-201(3)(a). The statute of frauds does not apply to contracts:

> if the goods are to be especially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement . . . ."

*N.J.S.A.* 12A:2-201(3)(a). According to the allegations in the Complaint, 3-Nitro was specially manufactured by Rongyao for Pfizer, 3-Nitro is not suitable for sale to others in the ordinary course of Rongyao's business (because Pfizer has an exclusive right to sell and Rongyao has an exclusive right to manufacture the product), and Rongyao has made a "substantial beginning" in that it spent millions of dollars designing, building and supplying the China Plant and getting all the necessary regulatory and governmental approvals. Accordingly, the Complaint adequately sets forth that an exception to the statute of frauds exists.

Every contract in New Jersey contains an implied covenant of good faith and fair dealing. "In every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 420 (N.J. 1997) (internal citations and quotations omitted). Pfizer's motion to dismiss does not challenge the viability of Count IV other than saying it is dependent on the existence of an enforceable contract, and the Court finds that Rongyao – in alleging that Pfizer voluntarily suspended sales of 3-Nitro – has made a

sufficient showing that Pfizer destroyed its rights to receive the fruits of the parties' alleged contract. Accordingly, Pfizer's motion to dismiss Counts I and IV is denied.

### D.     Count II: Implied Contract

Rongyao pleads, as an alternative request for relief, that it is entitled to relief under the theory of an implied contract. The party alleging an implied in fact contract must show the same elements required in an express contract: offer, acceptance, and consideration. *Gardiner v. V.I. Water & Power Auth.*, 145 F.3d 635, 644 (3d Cir. 1998). Unlike express contracts, however, proof of an implied-in-fact contract comes from "conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Id.* (internal citations omitted). Those elements have been adequately pled in this case. Pfizer's actions, as described in the Complaint, are inconsistent with Pfizer's claim in its motion papers that the parties never entered into a long term agreement for the manufacture of 3-Nitro and are sufficient to support a finding of an implied contract between the parties. Pfizer's argument that the statute of fraud bars the implied contract claim also fails for the reasons set forth above. Therefore, Defendant's motion to dismiss Count II is denied.

### E.     Count III: Promissory Estoppel

Count III of the Complaint seeks relief under a theory of promissory estoppel. In New Jersey, the elements of a promissory estoppel claim are (1) a clear and definite promise, (2) made with the expectation that the promisee will rely on it, (3) reasonable reliance, and (4) definite and substantial detriment. *Cotter v. Newark Hous. Auth.*, 422 Fed. Appx. 95, 99 (3d Cir. 2011) (citing *Toll Bros., Inc. v. Bd. Of Chosen Freeholders of County of Burlington*, 194 N.J. 223, 944 A.2d 1, 19 (N.J. 2008)). Rongyao argues that those elements are plead in the Complaint, as it states that: Alpharma made a promise to Rongyao to purchase 3-Nitro; Alpharma had the

expectation that Rongyao would rely on its promise; in reasonable reliance on Alpharma's representations Rongyao spent millions of dollars designing, building and supplying the China Plant and getting all the necessary regulatory and governmental approvals; and Rongyao suffered substantial losses as a result of its reliance (Compl. ¶¶ 69-75).

However, Rongyao's promissory estoppel claim is insufficient for several reasons. A clear and definite promise is the "*sine qua non* for [the] applicability of [promissory estoppel]." *Malaker Corp. v. First Jersey Nat'l Bank*, 163 N.J. Super. 463, 479 (App. Div. 1998). The Complaint is devoid of any specific allegations regarding who communicated the alleged promise to produce 3-Nitro many years into the future, when and where it was made, or what the specific parameters of the promise were. Although Rongyao does reference the MPA as the contract controlling the parties' relationship, it does not point to a "clear and definite" promise for the purposes of the promissory estoppel claim. Instead, the Complaint asserts that, in 2003 or 2004, "Alpharma indicated to Rongyao that it was seeking a long term commitment from Rongyao to produce 3-Nitro for many years into the future," and later makes the bare assertion that "Alpharma made a clear and definite promise to Rongyao to purchase 3-Nitro for many years in the future." (Compl. ¶ 20, 69.) Notably, Rongyao does not assert that this "clear and definite promise" is what is embodied in the MPA, nor could it; Rongyao cannot assert that the clear and definite promise, upon which it bases its promissory estoppel claim, was the promise contained in the MPA, because the MPA was not even drafted until sometime in 2011, while the "reasonable reliance" plead and allegedly possessed by Rongyao – the designing, building and supplying of Rongyao's China Plant and Rongyao's obtaining necessary regulatory and governmental approvals – occurred long before 2011. That is, the draft MPA did not even come into existence until three years after Rongyao allegedly relied on an unspecified promise to spend

10

millions of dollars on the China Plant and the regulatory and governmental approval process. This is an impossibility. Because Rongyao has not identified a clear and definite promise upon which it reasonably relied to its detriment, the promissory estoppel claim is dismissed.

### F.     Count V:  Breach of Fiduciary Duty

Rongyao also alleges a breach of fiduciary duty against Pfizer on the basis of Pfizer's failure to "exercise good faith, fair dealing and loyalty in its role as Rongyao's VMF agent by acting contrary to Rongyao's interests in unilaterally deciding to suspend sale of 3-Nitro in the United States and to withdraw 3-Nitro from other international markets." (Complaint ¶ 85). Pfizer, relying on *Goodman v. Goldman, Sachs & Co.*, 2010 U.S. Dist. LEXIS 132593 (D.N.J. Dec. 14, 2010), argues that the Complaint fails to adequately define the scope of the alleged fiduciary relationship or any specifics as to the associated duties that Pfizer has allegedly breached.  "A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *McKelvey v.* Pierce, 173 N.J. 26, 57 (2002) (quoting *F.G. v. MacDonnell*, 150 N.J. 550, 563 (1997)).  Here, while it is alleged – and undisputed by Pfizer – that Pfizer was Rongyao's VMF agent in the United States, Rongyao fails to define the scope of that relationship and fails to sufficiently show that, as Rongyao's VMF agent, Pfizer owed any fiduciary duties to Rongyao.  Pfizer's motion to dismiss Count V is therefore granted.

# ORDER

**IT IS** on this 21st day of September, 2012:

**ORDERED** that Defendant's motion to dismiss Counts I, II and IV is hereby DENIED (ECF No. 13); and it is further

**ORDERED** that Defendant's motion to dismiss Counts III and V is hereby GRANTED (ECF No. 13).

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.